```
         IN THE UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF ARKANSAS
                  FAYETTEVILLE DIVISION
```

**GERALD KING**                                                          **PLAINTIFF**

        **v.**                  **Civil No. 05-5168**

**METROPOLITAN LIFE**
**INSURANCE COMPANY**                                                    **DEFENDANT**

## ORDER

NOW on this the 11th day of March 2008, comes on for consideration Plaintiff's ERISA Brief (document #9) and Defendant's response thereto (document #10). The Court, having reviewed the Administrative Record, the briefs of the parties, and all other matters of relevance before it, and being well and sufficiently advised, finds and orders as follows:

1. Plaintiff Gerald King ("King") was a participant in a disability benefits plan (the "Plan") provided by Defendant Metropolitan Life Insurance Company ("MetLife") through his former employer, Siemens Corporation. The Plan provided both short-term and long-term disability benefits to eligible employees.

After being diagnosed with severe depression and bipolar disorder, King was found eligible for benefits under the Plan beginning in March 2004. Such benefits were later terminated by MetLife, after it determined that King was no longer "disabled" as defined by the Plan. King now appeals MetLife's decision to terminate his benefits under the Plan.

2. The procedural posture of this case is that of an administrative appeal. The facts are those contained in the Administrative Record and the standard of review is dictated by the terms of the Plan.

The Plan is governed by the provisions of the Employee Retirement Income Security Act ("ERISA"). Denial of ERISA benefits is "reviewed on a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).

If the administrator has discretionary authority, its eligibility decisions are reviewed for abuse of discretion. Groves v. Metropolitan Life Insurance Co., 438 F.3d 872 (8th Cir. 2006). That standard has been described as follows:

> In applying an abuse of discretion standard, we must affirm if a reasonable person *could* have reached a similar decision, given the evidence before him, not that a reasonable person *would* have reached that decision. A reasonable decision is fact based and supported by substantial evidence. We may consider both the quantity and quality of evidence before a plan administrator. And we should be hesitant to interfere with the administration of an ERISA plan.

Groves, 438 F.3d 872, 875 (internal citations and quotation marks omitted).

Although abuse of discretion review puts a heavy burden on a participant whose benefits have been terminated, it does not amount to "rubber-stamping the result." A termination decision must be

reasonable, i.e., "supported by substantial evidence that is assessed by its quantity and quality." Torres v. UNUM Life Insurance Co. of America, 405 F.3d 670, 680 (8th Cir. 2005). "Substantial evidence" is "more than a scintilla but less than a preponderance." Leonard v. Southwestern Bell Corp. Disability Income Plan, 341 F.3d 696, 701 (8th Cir. 2003).

3. In the instant case, it is undisputed that the Plan gives MetLife discretion to determine eligibility for and entitlement to benefits. See Firestone Tire & Rubber Co., 489 U.S. at 115 (1989) (stating that to qualify for deferential review, the plan administrator and fiduciaries under ERISA need only reserve discretionary authority to themselves in the Plan document); see also Clapp v. Citibank, N.A. Disability Plan (501), 262 F.3d 820, 827 (8th Cir. 2001) (holding that the "as determined by" provision in an insurance plan was explicit "discretion-granting language").

Specifically, the Plan provides that MetLife has "discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits." Such provisions have been held sufficient to give the claims administrator discretionary authority to determine eligibility. Ferrari v. Teachers Ins. and Annuity Ass'n, 278 F.3d 801 (8th Cir. 2002). The Court will, therefore, review MetLife's benefits-related decisions for abuse of discretion.

4. With the foregoing principles in mind, the Court has

examined the Administrative Record, from which it has derived the following relevant facts:

* Pursuant to the terms of the Plan, "disabled" or "disability" means that,

> Due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis; and (1) during your Elimination Period and the next 24 month period, you are unable to earn more than 80% of your Predisability Earnings or Indexed Predisability Earnings at your Own Occupation for any employer in your Local Economy; or (2) after the 24 month period, you are unable to earn more than 80% of your Indexed Predisability Earnings from any employer in your Local Economy at any gainful occupation for which you are reasonably qualified taking into account your training, education, experience and Predisability Earnings.

* King was employed by Siemens Corporation as a network engineer until March 22, 2004, when he ceased work based upon a claim of severe depression and bipolar disorder.

* Thereafter, on or about April 2, 2004, King submitted a claim to MetLife seeking short-term disability benefits.

* King listed Dr. Sharon Hausman-Cohen as his primary physician and Dr. James Kreisle as the psychiatrist he had been seeing for his bipolar disorder.

* MetLife obtained Plaintiff's medical records from Dr. Kreisle.  These records revealed that King was seen by Dr. Kreisle six times between March 22, 2004 and August 11, 2004.  Dr. Kreisle cited "bipolar disorder" as King's primary diagnosis.

* During King's visits with Dr. Kreisle, Dr. Kreisle noted

that King was severely depressed and experienced anxiety, fear, racing thoughts, decreased appetite, panic attacks, increased irritability, and had trouble sleeping.  From this, Dr. Kreisle concluded that King was unable to perform his job and stated that it was uncertain when King might be able to return to work.

* According to Dr. Kreisle's records, King assaulted his wife in January 2004 and threatened suicide.

* On June 3, 2004, King completed an Initial Functional Assessment Form – which analyzed his ability to perform work-related duties.  This assessment led Dr. Kreisle to further conclude that King was significantly impaired in his ability to maintain his safety and the safety of others, maintain a work pace appropriate to the workload associated with his position, and respond appropriately to supervision.  King was also extremely impaired in his ability to perform other work-related duties.

* Based on the medical records submitted by Dr. Kreisle, MetLife approved Kings' short-term disability benefits starting March 23, 2004.  MetLife continued to pay King's short-term disability benefits until September 27, 2004 – the maximum period allowed under the Plan.

* MetLife then began the process of evaluating King's condition to determine whether he met the Plan's requirements for long-term disability benefits.

* On October 11, 2004, a MetLife claims service representative

spoke with King. King indicated that he was staying with his mother because his wife was afraid of him. King further stated that he had been treated for depression for twelve years and was hospitalized for two weeks approximately twelve years ago. King further indicated that he had been taking medication for his depression since his hospitalization.

    * On October 15, 2004, MetLife approved King's long-term disability claim with an effective disability date of September 19, 2004. MetLife informed King that his benefits would cease if he was no longer disabled as defined by the Plan.

    * Subsequently, on December 1, 2004, MetLife contacted King for an update on his condition. King indicated that since moving to live with his mother, he was seeing a new psychiatrist, Dr. Erica Hiett.

    * MetLife obtained Dr. Hiett's medical records, which showed that Dr. Hiett first saw King on November 16, 2004. King reported to Dr. Hiett that he was depressed, experienced crying spells, did not want to get out of bed, and isolated himself. King stated that he only attended to his personal hygiene because his mother forced him to do so. King further reported feeling suicidal and having no energy.

    Dr. Hiett noted that King had a reported diagnosis of bipolar disorder, but that she was skeptical of this diagnosis because King did not report a good history of mania. Dr. Hiett further noted

that King appeared depressed.

* King's next and last appointment with Dr. Hiett was on January 10, 2005. King reported feeling better and he was involved in more activities. King stated that he was trying to decide whether to get a job because he would like to have some activity and most of his income was used to support his wife and children.

Dr. Hiett again noted skepticism at his prior diagnosis of bipolar disorder and stated that King appeared to be responding well to treatment. Dr. Hiett believed that obtaining employment would be good for King's self-esteem. Dr. Hiett believed that King was "greatly improved" from his last visit.

* King was scheduled to meet with Dr. Hiett again in three months. However, there are no medical records for King after January 2005 – indicating that King did not receive treatment after this date.

* On January 18, 2005, Dr. Hiett completed a Mental/Behavioral Functional Assessment of King. Dr. Hiett indicated that King suffered from major depression and that she was attempting to rule out whether he suffered from bipolar disorder. Dr. Hiett noted that King was well-groomed, pleasant, cooperative, and that his mood had improved. Dr. Hiett could not state what functional impairments were prohibiting King from returning to his job as she had "not assessed [King] for his ability to work." Dr. Hiett further indicated that she was unable to determine whether or when

King could return to work as it had not been the focus of her visits with him.

  * Thereafter, MetLife referred King's claim to Dr. Mark Schroeder, a psychiatrist, for an independent medical review. After reviewing medical records from Dr. Hiett, Dr. Schroeder concluded that the medical information did not support a "level of global psychiatric impairment that would continue to preclude the employee from performing his own occupation at this time."

Dr. Hiett had not noted any severe abnormalities in King's mental status examination.  Further, Dr. Hiett had stated that King was "greatly improved" between his first and second visits.

According to Dr. Schroeder, "the records from Dr. Hiett do not document severe psychiatric symptoms, such as suicidal or homicidal thoughts of intent or plan, psychotic or manic symptoms, panic attacks with agoraphobia or dissociative episodes, that may be associated with more severe impairment."

Dr. Hiett's notes did not reflect a detailed description of King's daily activities or functional abilities or specify why King's reported symptoms would prevent him from working.

Further, Dr. Schroeder noted that King was not receiving any intensive psychotherapy, and was not scheduled to see Dr. Hiett again for another three months.

  * MetLife sent Dr. Schroeder's report to Dr. Hiett for review and comment.  MetLife informed Dr. Hiett that if it did not hear

anything from her by March 11, 2005, it would assume that she was in agreement with the review.  Dr. Hiett did not respond.

* Based on the review performed by Dr. Schroeder and the documents in the Administrative Record, MetLife determined that King no longer met the Plan's definition of disability.  Thereafter, on March 18, 2005 MetLife terminated King's long-term disability benefits.

* King subsequently appealed MetLife's decision.

* On appeal, King submitted a taped conversation (made in July 2005) between King's counsel and Dr. Hiett – discussing her treatment of King.  At the time of this conversation, Dr. Hiett did not have her medical records in front of her and had not seen King for approximately six months.

During the taped conversation, Dr. Hiett explained that the first time she saw King he "looked pretty sick," but that he was looking a little better the next time she saw him.  While Dr. Hiett had previously indicated in the January 18, 2005 Mental/Behavioral Functional Assessment that she had not performed an assessment of King's ability to return to work, Dr. Hiett now stated that, as of King's last visit, he could return to *some* kind of work – but, not the work he had been performing previously.  Dr. Hiett further stated that she did not know what King's job consisted of other than what he had described to her.

When asked about Dr. Schroeder's report, Dr. Hiett reported

that it was accurate in that her notes did not reflect severe impairment. Dr. Hiett indicated that she was unable to offer her opinion about the report at the time it was sent to her by MetLife because of her busy schedule.

* No other information was submitted with King's appeal.

* MetLife referred King's claim and the information he submitted on appeal to psychiatrist Dr. Charles Clark for a second independent medical review.

Dr. Clark observed that King "had an episode of depression beginning in January 2004 which caused him to be unable to work and to leave his family. By January 10, 2005, the depression had largely cleared." No medical records were submitted past King's January 2005 records. Dr. Clark observed further that King had suffered with a mood disorder during most of his adult life, with multiple episodes of treatment. Dr. Clark concluded that the medical information did not support a finding that King was disabled from his own occupation.

* In view of the foregoing, MetLife upheld its discontinuance of King's benefits on appeal.

5. Pursuant to the Plan, it is a basis for termination of benefits that a participant is no longer disabled under the terms of the Plan, i.e., that he is no longer "unable to earn more than 80% of [his] Predisability Earnings or Indexed Predisability Earnings at [his] Own Occupation for any employer" in the local

economy due to mental illness.

In the Court's view, there is substantial evidence that King had reached this point by March 18, 2005. As noted in the independent medical reviews conducted at MetLife's request, as of King's last appointment with Dr. Hiett in January 2005, he had "greatly improved." Moreover, Dr. Hiett's records did not document any severe psychiatric symptoms, such as suicidal thoughts, panic attacks, or manic symptoms. Further, the frequency of King's appointments with a treating psychiatrist had decreased from an initial monthly basis to once every three months.

There is no evidence in the record that, as of March 2005, King was receiving any therapy or further medical treatment. Dr. Schroeder's independent evaluation concludes that the frequency of treatment "does not support the presence of severe psychiatric illness."

Finally, as Dr. Hiett did not assess King for his ability to work, she could not state what functional impairments, if any, were prohibiting King from returning to his specific occupation. While in the July 2005 taped conversation between Dr. Hiett and King's attorney Dr. Hiett opines that King was not fit to return to his former occupation, this conclusion is suspect – as Dr. Hiett had not at any point examined King's capacity to work.

When the foregoing history of King's claim for disability benefits is viewed as a whole, the Court believes it contains

substantial evidence supporting MetLife's conclusion that King's benefits should have been terminated as of March 18, 2005. The Court cannot say that no reasonable person could have reached the decision reached by MetLife in this case.

6. For the foregoing reasons, the Court finds that the decision of MetLife to terminate King's long-term disability benefits as of March 18, 2005, was supported by substantial evidence and should be affirmed.

**IT IS THEREFORE ORDERED** that the decision of Metropolitan Life Insurance Company to terminate the long-term disability benefits of Gerald King is **AFFIRMED**.

**IT IS SO ORDERED.**

> **/s/ Jimm Larry Hendren**
> **JIMM LARRY HENDREN**
> **UNITED STATES DISTRICT JUDGE**